UNITED STATES of America,
Plaintiff-Appellee,

v.

Richard W. EMENS, John L. Ribando,
Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Dennis William LATTER,
Defendant-Appellant.

Nos. 78–2722, 78–3153.

United States Court of Appeals,
Ninth Circuit.

April 14, 1980.

Rehearing Denied Aug. 11, 1980.

**654**

Howard E. Beckler, Hollywood, Cal. (argued), for defendants-appellants; Roger S. Hanson, Santa Ana, Cal., on brief.

Darrell W. MacIntyre, Los Angeles, Cal., for plaintiff-appellee.

Before GOODWIN and TANG, Circuit Judges, and EAST,* District Judge.

TANG, Circuit Judge:

The defendants, Richard Emens, John Ribando and Dennis Latter, were each convicted of one count of conspiracy to import and possess, with intent to distribute, marijuana. Emens and Ribando were also each convicted of one count of possession of marijuana with intent to distribute. The district court, following an evidentiary hearing, originally granted the defendants' motions to suppress evidence, and dismissed the indictment. The court then denied a Government motion to reconsider, stating that it lacked jurisdiction to reconsider its order suppressing the evidence since it had already dismissed the indictment. The Government appealed this ruling to this court which reversed, holding that the district court did have such jurisdiction. This court then remanded the case to the district court for reconsideration.

Following reconsideration and based upon further evidence, the district court reversed its original decision and denied the defendants' motions to suppress. The defendants each waived trial by jury and were found guilty after a court trial on stipulated facts. These appeals followed.

*Facts*

In late December, 1975, a Newport Beach boat salesman reported to the U. S. Customs Patrol Marine Support Unit in Los Angeles that he had recently sold two $25,000 28-foot Skipjack power boats, one tan and white and the other blue and white, to two brothers in their early twenties. The boat salesman found it unusual that two young men could afford the payments on these boats [1] and that they would purchase the boats for fishing purposes without having them outfitted with any of the normal fishing options.

The Customs officers checked the neighborhood where the purchasers stated they could be contacted and finding the area in a "deteriorating condition," decided to set up surveillance. From this surveillance, the officers determined that in addition to the two Skipjacks, the several persons observed were also utilizing a blue racing type Aqua Craft boat, numerous vehicles and two residences in Oxnard.

On January 15, 1976, at 8:00 p. m., a sheriff's deputy saw the blue and white Skipjack heading out to sea. It was next seen returning the following morning at approximately 9:30 a. m. riding noticeably low in the water. On January 16, at approximately 7:20 p. m., the officers observed the Aqua Craft, with two persons on board, head out to sea, followed at approxi-

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

1. One of the purchasers told the salesman that his father was the owner of a trucking company in the Santa Barbara area and that he was supplying the money to buy the boats.

mately 8:20 p. m. by the tan and white Skipjack. At approximately 9:00 p. m. the tan and white Skipjack met off the mouth of the Marina with another boat whose hull was of a racing type shape. These two boats headed south at a high rate of speed. The Skipjack returned to the Marina at approximately 11:00 p. m. and continued up the Marina's east channel toward the private dock of one of the Oxnard residences where it was observed berthed the following morning.

At approximately 8:45 a. m. on January 17, the Aqua Craft entered the harbor, riding noticeably low in the water. It was loaded onto a trailer by three men and towed[2] by a pickup truck past one of the Oxnard residences where a station wagon left and fell in line behind the boat. One person got out of the pickup and joined the individual in the station wagon. Two persons remained in the pickup, the windows of the Aqua Craft were blacked out, and the tires of the trailer were nearly touching the fenders.

The pickup and Aqua Craft proceeded to a private warehouse in Ventura. As the vehicles pulled into the warehouse area, the undercarriage of the trailer scraped the driveway. The two occupants, later identified as Emens and Ribando, parked the truck and boat beside the warehouse, got out of the truck and went into the rear door of the warehouse. They then exited the warehouse after opening two front overhead doors from the inside. Emens entered the cab of the pickup while Ribando remained next to the trailer.

At this time, the officers approached Emens and Ribando. Officer Brooks questioned Ribando, who appeared nervous and gave evasive answers to questions dealing with the ownership of the boat. The officer then stepped onto the trailer and observed marijuana debris on the floor of the Aqua Craft's cockpit. He returned to Ribando and patted him down.

Officer Rettenmaier approached Emens and asked him to step out of the pickup truck. In response to the officer's questions, Emens stated that he was not, nor did he know who was, the owner of the Aqua Craft, the pickup truck or the trailer. Emens stated that he had been out fishing, but that he did not have keys to the Aqua Craft. Officer Rettenmaier then obtained Emens' consent to search the pickup truck and the boat. The officers broke down the cabin door of the Aqua Craft and found numerous packages of marijuana.[3] At this time Emens and Ribando were placed under arrest.

While Emens and Ribando were being questioned, other officers had entered the warehouse and discovered the blue and white Skipjack. While checking the deck area to see if anyone was hiding there, the officers noticed marijuana debris with drag marks through it. Officer Brooks boarded the boat and discovered 90 pounds of marijuana in the engine compartment.

Contact was made with other officers who took all occupants of one of the Oxnard residences into custody and searched the tan and white Skipjack which was docked behind this residence. This search netted 2,750 pounds of marijuana. Several arrests were then made at the second Oxnard residence and a search of a pickup truck there netted another 2,462 pounds of marijuana.

The officers then stopped a pickup truck, driven by co-defendant Browne, and after detecting the odor of marijuana, they requested and received permission to search the truck and did so, finding marijuana debris.

Returning to the first residence, the officers learned that two individuals had telephoned and requested a ride from a hotel already known to the officers to be connected with these activities. Taking one of the participant's trucks, an officer picked up defendant Latter, who had previously been seen aboard the tan and white Skipjack,

---

2. The Aqua Craft was towed by a Chevrolet pickup truck, previously identified as being involved with the two Skipjack boats.

3. The marijuana found in the Aqua Craft was later found to weigh approximately 1,910 pounds.

and another co-defendant who were both arrested as they attempted to flee.

The officers later, through information from a co-defendant, located and searched another ship, the "Red Baron," at sea, which contained 11,000 pounds of marijuana. None of these searches were made pursuant to a search warrant.

On the basis of the above facts, the district court suppressed the evidence and dismissed the indictments. At the hearing upon reconsideration of this order, the government introduced evidence of large scale marijuana smuggling operations, including evidence of bales of marijuana found floating in the ocean, which had come to the attention of customs officers just prior to the surveillance of the defendants' activities. These smuggling operations were carried on from nearby marinas, one located directly across the bay from one of the Oxnard residences. Upon hearing this additional evidence, the district court denied the defendants' motion to suppress.

*Issues on Appeal*:

1. Whether the detention of Emens and Ribando was proper.

2. Whether the searches of the warehouse and the blue and white Skipjack was proper.

3. Whether the searches of the tan and white Skipjack, the pickup truck at the second Oxnard residence, the pickup truck driven by co-defendant Brown, and the "Red Baron" were proper.[4]

4. The government raises a fourth issue: whether the defendants lacked standing to seek suppression of the evidence. This argument was mentioned in the Government's original written opposition to Emens' and Ribando's motions to suppress, but was not pursued in the proceedings before the district court. The Government never made this argument in opposition to Latter's motion to suppress. It appears from the record that the Government conceded the standing issue before the district court and no factual record was made.

The general rule is that an appellate court will not review issues that have not been raised in the court below. *E. g. Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *U. S. v. Plechner*, 577 F.2d 596, 598 (9th Cir. 1978). The Government, like other litigants, is foreclosed from raising issues that it failed to present to the district court. *U.*

I

The standard for testing informal detentions for routine investigations stems from the Supreme Court decision in *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968), which held that "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21–22, 88 S.Ct. at 1880. In order to make a lawful investigatory stop, law enforcement officers must "have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). When the investigatory stop "is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits." *Id.*

The cause necessary to justify an investigatory stop is a "reasonable" or "founded" suspicion that the person has committed or is about to commit a criminal act. *U. S. v. Post*, 607 F.2d 847, 850 (9th Cir. 1979). *See U. S. v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *U. S. v. Holland*, 510 F.2d 453, 455 (9th Cir.), *cert. denied*, 422 U.S. 1010, 95 S.Ct. 2634, 45 L.Ed.2d 674 (1975). The founded or reasonable suspicion must arise from specific facts and not mere hunches,

*S. v. Lewiston Lime Co.*, 466 F.2d 1358 (9th Cir. 1972) *see U. S. v. Emery*, 541 F.2d 887 (1st Cir. 1976) (on defendant's appeal of denial of motion to suppress, the court would not consider the Government's contention, raised for the first time, that the defendant lacked standing.)

In *U. S. v. Tortorello*, 533 F.2d 809, 812 (2d Cir.), *cert. denied*, 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976), the Second Circuit entertained the Government's argument that the defendant lacked standing to challenge a search even though the Government had conceded the standing issue in the district court. There was a full factual record, however, before the *Tortorello* court. Given the lack of such a record in the instant case and the failure of the Government to present adequately this argument before the district court, we decline now on appeal to address the Government's standing arguments.

but the officer is entitled to draw inferences from those facts in the light of his experience. *U. S. v. Post, supra,* at 850. There must be some basis, however, from which the court can determine that the detention was not arbitrary or harassing. *U. S. v. Contreras-Diaz,* 575 F.2d 740, 744 (9th Cir.), *cert. denied,* 439 U.S. 855, 99 S.Ct. 167, 58 L.Ed.2d 161 (1978).

■ In the instant case, the defendants engaged in suspicious acts in an area linked with large scale marijuana smuggling activities. While buying expensive boats, taking late night trips, and returning with heavy loads may not alone have provided the rational suspicion necessary for an investigatory stop, all these acts were coupled in this case with evidence of recent marijuana smuggling activities in the area. Considering all the facts known to the officers, we cannot hold that the trial court's finding of rational suspicion was clearly erroneous. Following the detention of Emens and Ribando, the officers obtained Emens' consent to search the pickup truck and the Aqua Craft. Because consent is an exception to the search warrant requirement, we hold that the search of these vehicles and the seizure of evidence from them was proper.

## II

During the detention of Emens and Ribando and the search of the pickup truck and the Aqua Craft, other officers, without a search warrant, entered the warehouse and searched the blue and white Skipjack. The government offers no explanation why a search warrant could not have been obtained for this search, nor does it suggest what exception to the search warrant requirement apply.

■ Searches conducted without prior approval by a judge are per se unreasonable, subject to only a few exceptions. *Katz v. U. S.,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One such exception is the finding of probable cause coupled with exigent circumstances. *U. S. v. Stanley,* 545 F.2d 661 (9th Cir. 1976). Where the Government does not meet the warrant requirement, however, it has the burden of proving that the departure from this requirement was justified. *See Chimel v. California,* 395 U.S. 752, 762, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685 (1969).

■ In the instant case, the officers had conducted several days of surveillance, Emens and Ribando were detained and eventually handcuffed, and the boat was immobilized in a private warehouse.[5] In such a case, we cannot, nor are we required to, surmise what exigent circumstances the Government is relying upon to justify the searches of the warehouse and the blue and white Skipjack.[6] We, therefore, hold that these searches were unreasonable, and that the district court's denial of the defendants' motions to suppress as applied to the searches of the warehouse and the blue and white Skipjack was improper.

## III

■ Following the searches at the warehouse, the officers searched, with no warrants whatsoever, the tan and white Skipjack, the pickup truck at the second Oxnard residence, the pickup truck driven by co-defendant Browne, and the "Red Baron." Once again, the government offers not the slightest suggestion as to what exception to the search warrant requirement might apply.

5. This court has held that when a defendant is under arrest and handcuffed at his residence, his automobile may not be considered under his immediate control in order to justify a search incident to arrest. Further, there were no exigent circumstances such as the "automobile exception" present to justify that warrantless search. *U. S. v. McCormick,* 502 F.2d 281 (9th Cir. 1974).

6. By offering no exception to the search warrant requirement which would apply to the search of the warehouse and the blue and white Skipjack, the Government appears to be arguing that the defendants must anticipate and rebut any conceivable theory that might have justified the searches. This is not the law. The Government bears the burden in cases of warrantless searches, and at no time does it shift to the defendant.

At this juncture, we decline to carry the government's burden to justify warrantless searches which are otherwise per se unreasonable. The search warrant requirement, grounded in the Fourth Amendment, requires that the Government come forward and affirmatively overcome the presumption of illegality of warrantless searches. It has not done so in this case, and we thus hold that the trial court's denial of the defendants' motions to suppress as applied to the searches of the tan and white Skipjack, the pickup truck at the second Oxnard residence, the pickup truck driven by co-defendant Browne, and the "Red Baron" was improper.

Affirmed in part and reversed in part, and remanded for proceedings not inconsistent with this opinion.