**UNITED STATES of America,
Plaintiff,**

v.

**John McCARTNEY, Defendant.**

**No. 1:07–cr–0151 OWW.**

United States District Court,
E.D. California.

March 19, 2008.

---

1216

Kimberly A. Sanchez, United States Attorney, Fresno, CA, for Plaintiff.

Robert Warren Rainwater, Federal Defender, Fresno, CA, for Defendant.

## MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

OLIVER W. WANGER, District Judge.

Before the Court is Defendant's Motion to Suppress the seizure of a machine gun from his vehicle on May 23, 2007, at approximately 1:00 a.m. in Bakersfield, California, and the subsequent search of his residence pursuant to a search warrant,

both as unlawful and in violation of the Fourth Amendment.

### THE FACTS

Evidentiary hearings were held January 11, 2008, and March 7, 2008. Agent Howard Sanders, Special Agent for the Bureau of Alcohol, Tobacco & Firearms since 1983, testified that on May 23, 2007, he received a call from a confidential informant, the mother of one of the Defendant's children, with whom the Agent had been working for over a year and had talked to over twenty times. Agent Sanders was advised on May 23 by the informant that the Defendant, John McCartney, was then in possession of a machine gun which had been placed in the Defendant's white pick-up truck at the informant's home.

Agent Sanders responded to the area of the residence to establish surveillance. The Agent observed a white Ford pick-up truck and parked down the block. The Agent learned that he had established surveillance on the wrong vehicle when he received word that the Defendant's vehicle had moved.

Agent Sanders then spoke with the informant who told him that the truck had left her residence to go to the Winco Supermarket. Agent Sanders traveled to the Winco Supermarket in Bakersfield, California, and saw the white Ford pick-up truck. Agent Sanders set up surveillance and waited for the vehicle to leave. At that time Agent Sanders contacted the Kern County Sheriff's Office and spoke with a watch commander. Agent Sanders told the watch commander that the Defendant was in the area, that Defendant had a machine gun with him and that the Defendant would be traveling later to the Defendant's residence.

Agent Sanders then spoke directly with Kern County Deputy Avery Simpson and asked Deputy Simpson to establish surveillance and to be prepared for Defendant's vehicle to move.

Agent Sanders told Deputy Simpson that Agent Sanders had information from the confidential informant that there was a machine gun in Defendant's vehicle and that the Defendant would be traveling out of the area. As Agent Sanders observed Defendant leave the parking lot in Defendant's truck, the Agent called Deputy Simpson and advised as to the direction the vehicle was traveling.

The Agent did not follow immediately and next made contact after Deputy Simpson had effectuated a traffic stop and taken Defendant into custody.

Later the same morning, Agent Sanders performed a field test examining the firearm without firing it, by operating the trigger mechanism, and determined that it functioned as a fully automatic machine gun.

Agent Sanders then applied for a search warrant for the Defendant's residence based, in part, on the traffic stop and the machine gun found in Defendant's car and additional information acquired from the cumulative four year investigation of Defendant. Agent Sanders testified that based on the ongoing investigation of Defendant, Sanders would have sought the search warrant even without receiving information about the seized machine gun from the informant and the seized machine gun.

Defendant established, in cross-examination, that the informant is an individual who is the mother of one of the Defendant's children, who was present at her residence with the Defendant before she telephoned Agent Sanders. Agent Sanders has known the confidential informant since August of 2006 and was not aware that there was a dispute between the informant and Defendant over child custody.

Agent Sanders understood that the informant had custody of the child.

Agent Sanders had been investigating the Defendant since August of 2006. Other ATF Agents had been investigating the Defendant since October of 2003. No previous search warrant was sought, because the investigation had closed when the prior case agent transferred out of the Bakersfield ATF office. Agent Sanders believed that information about the Defendant's activities from 2003 and 2004 was still relevant.

Agent Sanders had talked to the informant between 12 and 24 times before the May 23, 2007, search. Agent Sanders had never verified any information provided by the informant by actually observing weapons.

Agent Sanders stated that information provided to him by the informant was corroborated by other sources of information and by Agent Sanders' observations at the Defendant's residence which confirmed certain things the informant described. The information provided by the informant, that was cross-corroborated by other sources, and the Agent's direct observations, included that the Defendant held anti-government beliefs, that he was heavily armed, including with machine guns, explosives, and silencers. This information was told to Agent Scott before August 2006, who provided the information to Agent Sanders. Agent Sanders had actually observed silencers in Defendant's possession. Three other informants described Defendant as associated with a militia group that held anti-government opinions and believed in being armed and prepared for either the U.S. government or a foreign government conducting some type of activity against their interests or against their personal rights. Some of the confidential informants were reported as being part of the group.

Kern County Sheriff's Deputy Simpson testified that he was on duty May 23, at approximately 1:00 a.m., in uniform, in a marked vehicle. Deputy Simpson received a message that ATF Agents were in his zone conducting surveillance on a residence. Pursuant to the message, Deputy Simpson called Agent Sanders, who then told Deputy Simpson that Agent Sanders had a confidential informant who told Sanders that Defendant had a machine gun in his vehicle and the Agent would get back to Deputy Simpson.

Shortly after, Agent Sanders told Deputy Simpson he had Mr. McCartney under surveillance at the Winco Shopping Center on Coffee Road in Bakersfield, California.

Agent Sanders reported to Deputy Simpson that Defendant was moving again in his vehicle out of the parking lot and that Agent Sanders would like Deputy Simpson "to find some probable cause to stop the vehicle."

A short time later, Agent Sanders called Deputy Simpson and told Deputy Simpson the vehicle was moving. Deputy Simpson moved behind the vehicle and followed it for a short time because Agent Sanders wanted Deputy Simpson to get Defendant's vehicle out of the area.

Deputy Simpson was traveling eastbound on Hageman Street approaching the red light at Fruitvale Avenue where he observed Defendant slowing for the red light. Deputy Simpson noticed that Defendant's truck's left brake light was inoperable. Defendant's left brake light did not illuminate at all, like the right one on the right-hand side of the truck when Defendant applied his brake.

Deputy Simpson conducted a traffic stop by activating his solid red light. Defendant yielded a short time later. Deputy Simpson made contact with Mr. McCartney and explained why Defendant was

stopped. Deputy Simpson asked for Defendant's vehicle registration and proof of insurance. Defendant looked around in the vehicle for a time and then told Deputy Simpson that Defendant did not have registration or proof of insurance. The vehicle had dealer plates, no actual license plates. Deputy Simpson then conducted a records check using the Vehicle Identification Number and confirmed that the vehicle's registration had been expired more than six months, since January of 2006.

Deputy Simpson ordered Defendant to exit the vehicle and advised Defendant he was being detained pending a traffic citation. Defendant was told that Deputy Simpson was going to have to tow Defendant's vehicle. Deputy Simpson asked Defendant if there was anything illegal in the vehicle. Defendant said there was not and "it didn't matter anyway." Deputy Simpson conducted an impound inventory of the vehicle for the tow and located a machine gun in several different pieces in two bags in the vehicle.

Deputy Simpson is a sworn peace officer in the State of California and towed and stored the vehicle pursuant to his discretion expressly provided by California Vehicle Code § 22651(o) (1). Pursuant to the Kern County Sheriff's Department's then-existing policy and procedures, an impound form, Exhibit 1 in evidence, is utilized whenever the Kern County Sheriff's Department tows or recovers a vehicle. An inventory of the contents of the vehicle and a record of whatever property is found in the vehicle must be made.

The form is then turned in to the Sheriff's Department and the record is mailed to the legal owner and registered owner of the vehicle. Deputy Simpson completed the form and complied with the mailing procedure.

The actual inventory and contents of Defendant's vehicle is described in Exhibit 2 in evidence. Exhibit 2 is a Kern County Sheriff's Department Vehicle Recovery and Storage Report. The vehicle was then impounded at Golden Empire Towing until it was picked up from the impound facility on June 21, 2007.

After inventory of the vehicle, Mr. McCartney was placed under arrest. Another Deputy was present throughout the traffic stop and search of the vehicle. Deputy Simpson identified Defendant as the individual whose vehicle he stopped and whose vehicle from which the firearm was recovered. At the time of the stop when Mr. McCartney pulled over, Deputy Simpson and another patrol car were in the vicinity of Defendant's vehicle. Neither party called as a witness the other Deputy who was in a separate vehicle. Deputy Simpson testified that the left rear taillight on the truck did not illuminate or "did not shine;" "that light didn't show." Deputy Simpson stated that is the reason why he pulled the vehicle over, the probable cause he found to pull the vehicle over.

Deputy Simpson found the machine gun in several pieces in the back floorboard. Parts of the machine gun were in a duffle bag, part in a laundry bag. The machine gun was found during the inventory search. In the parking lot, Agent Sanders and Deputy Simpson "field-tested" the machine gun by working the trigger mechanism and found it to be fully automatic. Deputy Simpson testified that "you don't have to actually fire the weapon to field-test it."

The vehicle was impounded by Golden Empire Storage, where it was taken from the arrest scene on May 23, 2007, until it was picked up by the Defendant's son, Josh McCartney, on June 21, 2007. Golden Empire Towing is a Kern County Sheriff's Department-approved towing and storage facility. Deputy Simpson had no role in approving the pick-up of the vehicle, however, he stated some officer from

the Sheriff's Department had to approve picking up the vehicle. Deputy Simpson had no knowledge about who picked up the vehicle as he was not present.

The defense presented the testimony of Manuel Vasile, a Federal Defender's investigator employed in June of 2007 in the Eastern District of California at Fresno.

Mr. Vasile went to Golden Empire Towing in June, 2007 where he videotaped the taillights of the vehicle. The videotape revealed that the left rear taillight was then fully covered with masking tape and that when the brakes of the truck were applied, both taillights illuminated each time. The video showed that tape completely covered the left rear taillight. The video was made June 22, 2007. Mr. Vasile had no knowledge about the assembly of the rear taillight or its function.

Joshua McCartney, the son of the Defendant, testified that he was with Mr. Vasile on June 22, 2007, when the taillights on Defendant's truck were tested. Joshua McCartney stated that the taillight on the left side was damaged when he was driving the truck and the tailgate came off on one side, swung, and broke the red glass lens on the left taillight. Joshua McCartney testified that on the day Defendant was arrested, he saw the left taillight, that it "seemed to be operable and had tape covering it." The tape covered the whole brake light area.

Josh McCartney stated that everything seemed to be fine with the taillight with the exception of the red lens, which was missing. After Josh McCartney picked the truck up, he took the "whole taillight assembly out and replaced it."

At a subsequent hearing, the government called Peter Fina, a master Ford-trained mechanic, who testified that he was familiar with the Ford F150 taillight assembly and its operation, repair, and replacement. Mr. Fina testified that an entire taillight assembly does not need to be replaced for a broken lens. The lens can be replaced separately, as can a light bulb, if the bulb is not operating.

Deputy Simpson did not describe the taillight nor did he examine the taillight at the scene of the arrest. He did not state whether or not he observed masking tape on the taillight, nor was he asked to describe the taillight as he observed it at the stop. The second Deputy who was in a separate vehicle and present when Deputy Simpson made the arrest was not called to testify about whether he observed the left taillight in operation. The testimony of the investigator and Defendant's son raise substantial question about whether the taillight was illuminating the evening of May 23, 2007. Deputy Simpson testified the inoperative taillight provided primary probable cause for the vehicle stop.

No explanation was offered for why the Defendant did not contact the government about the physical test of the taillight in June of 2007, and did not invite inspection and testing of the taillight before it was irrevocably modified by replacing the entire taillight assembly. According to the government's expert, it was unnecessary to replace the whole assembly, if all that was required to be replaced was a broken lens. There is nothing privileged, nor strategically advantageous to prevent timely disclosure for inspection and testing of important physical evidence that calls into question the efficacy of a basis for probable cause.

Here, Joshua McCartney's actions with respect to the vehicle made it impossible for any independent testing and corroboration of the state of the wiring, the age and condition of the bulb, its filament, presence of corrosion in the assembly, and the overall operability of the entire taillight assembly. It is impossible to know whether the filament in the taillight bulb was loose, whether wiring was loose or shorting,

whether corrosion or other adverse condition prevented the taillight from operating or caused the taillight to operate intermittently. The replacement of and failure to retain the entire taillight assembly prevented verification of whether both versions of the facts, including the Deputy's observation at the time of the arrest, and the investigator's observation a month later at the storage yard, were consistent or inconsistent.

When the Deputy stopped the Defendant and asked Defendant to produce license and registration, Defendant had no vehicle registration in his possession, as required by law. An immediate check of DMV records showed that Defendant's registration for the truck had expired more than a year earlier. There is no dispute that the Officer, pursuant to the California Penal Code, had the authority and discretion to impound and inventory the vehicle and its contents. The government has not argued inevitable discovery, except as it relates to the inventory search of the impounded vehicle in connection with the arrest of the Defendant.

## LAW AND ANALYSIS

### A. STANDING

■ The government questions whether Defendant has standing to challenge the search of his vehicle and residence and the seizures of the machine gun from the vehicle and other evidence from the residence. To establish standing, a person claiming a Fourth Amendment violation must demonstrate a legitimate expectation of privacy in the place to be searched or the thing seized. *United States v. Gamez–Orduno*, 235 F.3d 453, 458 (9th Cir.2000). The owner of an automobile has an expectation of privacy in the vehicle and standing to object to an unconstitutional search. *United States v. Thomas*, 447 F.3d 1191, 1197–98 (9th Cir.2006).

■ Here, Mr. McCartney owned the pick-up truck and was its driver. He enjoyed an expectation of privacy in the vehicle and has standing to challenge an alleged unreasonable search and seizure of the vehicle.

■ Mr. McCartney was the owner of the residence subject of the government's search warrant and, as the owner of that real property and residence, has standing to object to any unlawful search and seizure, if the search warrant was obtained illegally. *Agnello v. United States*, 269 U.S. 20, 33, 46 S.Ct. 4, 70 L.Ed. 145 (1925) (homeowner has protectable privacy interest).

### B. SEARCH OF THE TRUCK

■ The Fourth Amendment's prohibition of unreasonable searches and seizures extends to seizures of the person, including the brief investigatory stop of a vehicle. *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). An officer may not detain a motorist without "reasonable suspicion." *United States v. Rodriguez*, 976 F.2d 592, 594 (9th Cir.1992), amended by 997 F.2d 1306 (9th Cir.1993).

■■ Reasonable suspicion consists of specific, articulable facts which, together with objective and reasonable inferences, "form the basis for suspecting that the particular person detained is engaged in criminal activity." *U.S. v. Diaz–Juarez*, 299 F.3d 1138, 1141 (9th Cir.2002); *Rodriguez* at p. 594. Reasonable suspicion must be based on individualized suspicion of the particular person to be stopped. *United States v. Montero–Camargo*, 208 F.3d 1122, 1131–32 (9th Cir.2000), *cert. denied*, 531 U.S. 889, 121 S.Ct. 211, 148 L.Ed.2d 148 (2000).

■ Reasonable suspicion "is formed by specific, articulable facts which, togeth-

er with objectionable and reasonable inferences, form the basis for suspecting the person detained is engaged in criminal activities." *United States v. Rojas–Millan,* 234 F.3d 464, 468–69 (9th Cir.2000). The totality of the circumstances is examined to determine whether the detaining officer had a particular and objective basis for suspecting criminal wrongdoing. *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). The government has the burden to justify a warrantless arrest and a warrantless intrusion on a Defendant's Fourth Amendment rights. *United States v. Emens,* 649 F.2d 653, 657 n. 5 (9th Cir.1980).

■■■ The decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). In effecting a vehicle stop, an officer may rely on training and experience to draw inferences from facts observed; those inferences must be grounded in objective facts and capable of rational explanation. *United States v. Mariscal,* 285 F.3d 1127, 1130 (9th Cir. 2002). A minor traffic violation can give rise to a custodial arrest. *Atwater v. City of Lago Vista,* 532 U.S. 318, 323, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) (first time seat belt offense justified arrest with one hour detention at police station).

■■■ In this case, the collective knowledge doctrine applies. *United States v. Ramirez,* 473 F.3d 1026, 1032–33 (9th Cir. 2007) (court can aggregate the facts known to each officer when they communicate, even if information is not actually communicated to the arresting officer). The specific and articulable facts which were available to Deputy Simpson include: (1) he observed the left rear taillight of Defendant's truck did not illuminate, a violation of the California Vehicle Code; (2) he had received information from Agent Sanders

that a confidential informant of Agent Sanders' had provided current information that Defendant was then in possession of a machine gun in Defendant's truck; and (3) Deputy Simpson understood that Defendant was under investigation for possession of illegal firearms and had been asked by Agent Sanders to find probable cause to effect a traffic stop of Defendant's vehicle. A court must determine whether, under the totality of the circumstances the "collective knowledge" of the investigating officers supported probable cause to make the arrest. *United States v. Del Vizo,* 918 F.2d 821, 825–26 (9th Cir.1990) (where there has been communication among agents, probable cause can rest upon investigating agents' collective knowledge). Defendant and his truck matched the description Deputy Simpson had been given. The informant's reported knowledge of Defendant's possession of the machine gun, imparted to Agent Sanders, was cross-corroborated by other informants who had been told about and had observed Defendant with weapons on prior occasions.

## C. *THE TAILLIGHT*

Deputy Simpson testified unequivocally that the left rear brake light of the vehicle did not illuminate when Defendant braked to stop at a stop light at Fruivale Avenue where it intersects with Hageman in Bakersfield, California around 1:00 a.m. Defendant's son and an investigator, videotaped the taillight approximately one month later at Golden Empire Towing, where the taillight illuminated in response to pressure on the brake pedal. Although Defendant argues the "only possible inference" from the evidence is that the "right brake light was working," Officer Simpson's testimony establishes that the only witness to the traffic stop on May 23, 2007, who testified, without qualification, that the left rear brake light was not operating in the street.

Defendant's witnesses testified that at the towing facility one month later, the "right" rear taillight operated. *See,* Defendant's Supplemental Memorandum of Points and Authorities, p. 5:1–5 (Defendant refers to the "right" rear brake light). The government's witness, Peter Fina, testified that a loose or worn filament, faulty wiring, a defective or insecure bulb, or corrosion in the taillight mechanism, may all cause a brake light to illuminate intermittently or not at all.

Defendant's son, Joshua, testified that he took the entire brake light assembly and replaced it after Defendant's truck was retrieved from the impound facility following June 22, 2007, although the son did not describe any need to replace the whole assembly. The bulb was separately replaceable, the lens that Joshua McCartney claimed was broken, was separately replaceable, and Joshua McCartney never stated that there was any other problem with the taillight, except that the lens was broken. Joshua McCartney, instead of inviting law enforcement to be present at the time of the test, and instead of preserving the taillight assembly so it could be examined and tested, replaced the entire taillight assembly and disposed of it to make impossible verification of its condition. From these facts, the Court draws the negative inference that if the taillight was suffering only from a broken lens, there was no reason to replace the entire assembly. The failure to offer and permit inspection and testing of the assembly calls into question the credibility of Joshua McCartney's conduct. Joshua McCartney also testified that he had seen the taillight before the arrest, the day of the arrest, and that it was operating.

No other evidence impeaches Deputy Simpson's testimony. Deputy Simpson has no prior acquaintance with the Defendant, nor is there any reason to question Deputy Simpson's credibility. It was not a Kern County investigation. Defendant describes the Deputy's testimony about illumination of the brake light as "mistaken." *See* P & A, p. 5:1. The evidence provides no basis on which to find Deputy Simpson incredible. No questioning specifically established that the left rear taillight was covered by masking tape on May 23, 2007, at the scene of the traffic stop. No testimony was elicited from any witness about the condition and appearance of the taillight as it was observed at the time of the vehicle stop.

Deputy Simpson testified that the left taillight did not illuminate when the truck came to a stop. Given that the bulb could have been activating intermittently; that wiring could have been faulty; that corrosion of the housing could have affected its performance as Mr. Fina testified; there are electrical-mechanical reasons why a taillight would not illuminate a month earlier at the scene of the stop and would illuminate at Golden Empire Towing a month later. Defendant's evidence does not overcome the specific uncontradicted testimony of Deputy Simpson that the left taillight did not illuminate at the time of the stop, which gave him probable cause to stop the vehicle.

██ A malfunctioning brake light violates California Vehicle Code § 24603(b). This provided Deputy Simpson probable cause to act lawfully when he stopped the vehicle because the vehicle's left rear taillight was not properly functioning. Deputy Simpson then discovered that the vehicle lacked registration, which had expired more than a year prior. This was a separate violation of California Vehicle Code § 4000. The Defendant had no proof of insurance on his person or in his vehicle and was unable to produce either a current registration to the vehicle or proof of insurance upon request by Deputy Simpson.

The failure to have proof of insurance violated California Vehicle Code § 16028(a).

Deputy Simpson had authority to impound Defendant's vehicle under California Vehicle Code § 22651(*o*)(1), which provides:

> Any peace officer ... who is engaged in directing traffic or enforcing the parking laws and regulations, of the City, County, or jurisdiction of a State agency in which a vehicle is located, may remove a vehicle located within the territorial limits in which the officer or employee may act, under any of the following circumstances:
>
> ...
>
> (*o*) (1) When any vehicle is found or operated upon a highway, any public lands, or an off-street parking facility with a registration expiration date in excess of six months before the date it is found or operated on the highway .... However, whenever the vehicle is occupied, only a peace officer, as defined in Chapter 4.5 (commencing with section 830) of Title 3 of Part 2 of the Penal Code, may remove the vehicle.

Here, Defendant's registration had been expired since January of 2006, more than six months prior to the date of the vehicle stop on May 23, 2007. Deputy Simpson was a peace officer engaged in directing traffic or enforcing parking laws and regulations of Kern County. Deputy Simpson was authorized to remove Defendant's vehicle.

## D. *INVENTORY SEARCH*

■■■■ When a vehicle enters police custody, law enforcement officers are permitted to inventory search the vehicle and inventory and impound its contents. *South Dakota v. Opperman,* 428 U.S. 364, 372, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). In *Opperman,* a car was impounded after having twice been ticketed for being illegally parked. Pursuant to the impound procedure, the contents of the car were inventoried during an inventory search of the vehicle. Marijuana was discovered. The vehicle inventory search was lawful and justified to protect law enforcement against unjustified claims of lost or stolen property and to protect law enforcement officers from possible danger. *Opperman,* at 369, 96 S.Ct. 3092.

Deputy Simpson's inventory search revealed the machine gun which was broken down in pieces contained in two bags. Upon assembly, Agent Sanders and Deputy Simpson field-tested the machine gun, conducting a presumptive test which involved pulling the trigger, and found it to operate in fully automatic mode.

■■■■ The traffic stop for an inoperative left rear taillight was lawful, Defendant's truck was lawfully impounded for his failure to possess a current registration, as the truck registration had expired over six months earlier, in January of 2006. As a peace officer for Kern County, Deputy Simpson had the authority to inventory search the vehicle pursuant to his impound authorization. The inventory search of the vehicle was lawful.

## E. *PROBABLE CAUSE THROUGH INFORMANT*

The Deputy did not testify to his suspicion that Defendant possessed a machine gun in his truck, based on the information Agent Sanders provided to Deputy Simpson. Deputy Simpson had been contacted by Agent Sanders, who advised that an informant had just provided information to Agent Sanders that a white Ford F150 pick-up truck operated by John McCartney was at a local Winco Supermarket and that Defendant had a machine gun in the vehicle.

Agent Sanders had had more than twenty separate conversations with the informant, who shared a child with the Defen-

dant. The informant had provided prior information to Agent Sanders that the Defendant was a member of a group holding anti-government views that had survivalist objectives, meetings, weapons, including machine guns and grenades, all of which had been personally observed by the informant. At least three other individuals cross-corroborated the informant's description of the Defendant's anti-government views, the group, the meetings, his possession of weapons, including machine guns, and that they had personally observed that Defendant possessed firearms, survival gear, and assembled and/or possessed machine guns.

Deputy Simpson was permitted to rely on information provided by the ATF Agent, who requested assistance in addressing probable cause to believe Defendant possessed a machine gun in Defendant's truck in the early morning of May 23, 2007. As *Ramirez* establishes, even if unarticulated, the collective knowledge of law enforcement officers engaged in the same investigation can provide probable cause.

Defendant argues that the ATF had been investigating him since August of 2006 by Agent Sanders and at least three years prior, by another ATF Agent named Scott. No previous search warrants or arrest warrants were sought based on the investigation. Although the four informants reported that Mr. McCartney possessed a machine gun, a grenade, and silencers, no direct observation of these weapons was made by the agents, except through informants.

 Defendant further argues that Agent Sanders had spoken with the informant, the mother of Mr. McCartney's child, approximately 24 times between August of 2006 through May, 2007. The Agent did not find any weapons or other evidence of a violation of the law by Defendant during that period until the tip concerning possession of the machine gun on May 23, 2007. Agent Sanders did confirm by personal observation, the accuracy of the informant's description of Defendant's residence and the other informants' reports about the Defendant possessing weapons and a machine gun. The totality of Agent Sander's and Deputy Simpson's objectively reasonable belief in the accuracy of the information provided to him by Agent Sanders, a Federal law enforcement officer, that Defendant was in possession of a machine gun in his truck on May 23, 2007, provided Deputy Simpson with a duty to investigate and detain Defendant relative to an articulated good faith belief in the particularized suspicion that the Defendant then possessed a machine gun. This alternative ground meets the constitutional minimum to justify the vehicle stop and search.

## F. THE SEARCH WARRANT FOR DEFENDANT'S RESIDENCE

Defendant contends that the residence search and seizure of more weapons must be suppressed as "fruit of the poisonous tree," as it was the product of an unlawful search of Defendant's truck and illegal seizure of the machine gun. The government rejoins that, *arguendo*, even if the vehicle search is infirm, that sufficient independent probable cause exists for the search warrant of the residence, after excising any reference to seizure of the machine gun from the Defendant's truck, to justify the search of Defendant's residence. *United States v. Barajas–Avalos*, 377 F.3d 1040, 1054 (9th Cir.2004).

In the affidavit supporting the search warrant, Special Agent Helen Dunkel averred, *inter alia*, that Defendant had been under investigation since October 22, 2003. That Defendant was a member of an anti-government, right-wing extremist group operating out of Caliente and Bak-

ersfield, California. A confidential informant who had a close personal relationship with Defendant believed that the Defendant had betrayed her. Defendant owned the residence at 42176 Indian Oak Road, Caliente, California 93518. Defendant came into an inheritance sometime before April, 2003, began stockpiling weapons, ammunition, night vision goggles, and other survival supplies. Defendant told the CI that some of the firearms were machine guns. The CI related to ATF Agent Scott that Defendant ordered firearms kits through the mail and told the CI that a firearm kit lacked one piece needed to make the firearm into a machine gun. That over time Defendant acquired three firearm kits which were converted to machine guns.

On an occasion following the summer of 2003, Defendant was in an auto accident, called the confidential informant to pick him up. When the confidential informant picked up Defendant, Defendant ran into an apple orchard, picked up a firearm and told the informant that he would be arrested if the police found the firearm because it was a fully automatic weapon.

Defendant also told the confidential informant that he assembled firearms, barrels and silencers in the garage located behind his residence. The confidential informant personally observed Defendant make a firearm silencer with a machine. The informant saw Defendant affix the silencer to the end of a gun and heard muffled sounds the informant believed were two gunshots. Defendant returned to the garage and stated to the informant that he needed to continue to work on the silencer because it did not fit properly.

The confidential informant also observed a box filled with hand grenade shells in Defendant's garage. Defendant also showed the informant a tubular device that looked like a pipe, about which the Defendant stated, that if a detonator was attached, and a car ran over it, it would explode. A second informant stated that he had seen numerous weapons at Defendant's residence, that Defendant had attempted to recruit the second informant to the group and that the second informant was worried about a friend who Defendant was "brain washing." A third informant observed Defendant with a purchased "sten gun" kit, which Defendant described as "automatic." The third informant understood that Defendant made the sten gun kit into a machine gun. The third informant also observed hand grenade shells in Defendant's garage in November of 2003.

Defendant has no registered title to firearms in the National Firearm Registration and Transfer Record. The third informant had extended discussions with Defendant about Defendant's anti-government views, possession of weapons, and a sabotage book. Defendant told the third informant that it was legal to possess machine guns if a $200 tax was paid on the firearm.

A fourth informant reported that Defendant is well armed, including with machine guns, silencers, large caliber rifles, has explosives and counter-surveillance equipment. Informant Four was told by Defendant that Defendant will use deadly force if law enforcement attempts to take action against Defendant. Defendant told Informant Four that Defendant is using his inheritance of approximately two million dollars to purchase firearms, possibly explosives, survivalist equipment and other items to prepare for attack by law enforcement or the U.S. or foreign governments. At least three of the informants stated that Defendant hides firearms at or near his residence to avoid detection.

 The affidavit further included description of the vehicle stop, impound and inventory of the vehicle and recovery of a fully automatic sten gun. However, even

excising, *arguendo,* the vehicle search and seizure, the affidavit is sufficient to establish probable cause to search Defendant's residence. The information about the seized machine gun is itself independently sufficient to establish probable cause for search of the residence.

Although Defendant has standing to object to the search and seizure at his residence, at 42176 Indian Oak Road, Caliente, CA 93518, the affidavit, with or without the vehicle stop and seized machine gun, provides probable cause for the issuance of the search warrant for Defendant's residence. The search and seizures pursuant to a valid warrant are here lawful.

## CONCLUSION

For all the reasons stated above, Defendant's motions to suppress are DENIED. IT IS SO ORDERED.